John JACKSON, et al., Plaintiffs,

v.

**SELECT PORTFOLIO SERVICING, INC., et al., Defendants.**

**Civil Action No. 08–0628–WS–M.**

United States District Court,
S.D. Alabama,
Southern Division.

July 31, 2009.

Kenneth J. Riemer, Mobile, AL, for Plaintiffs.

James Ethan McDaniel, John David Collins, Maynard, Cooper, and Gale P.C., Birmingham, AL, for Defendants.

## ORDER

WILLIAM H. STEELE, District Judge.

This matter is before the Court on the report and recommendation ("R & R") of the Magistrate Judge recommending that

this case be remanded to the Circuit Court of Mobile County. (Doc. 24). The defendants have filed an objection and two briefs in support thereof, (Docs. 25, 26, 33), while the plaintiffs have filed a brief in support of the R & R. (Doc. 32). After carefully considering the foregoing, and reviewing de novo those portions of the R & R to which objection has been made, the Court concludes that the R & R is due to be adopted. The Court pauses merely to make a few additional comments.

■ A settlement offer can of course constitute an "other paper" within the meaning of 28 U.S.C. § 1446(b). *Lowery v. Alabama Power Co.*, 483 F.3d 1184, 1213 n. 62 (11th Cir.2007). The question is whether this specific settlement demand, given all the evidence presented, established by a preponderance of that evidence that the amount in controversy exceeds $75,000. At bottom, the defendants insist that the plaintiffs' demand of $155,000 must meet this standard simply because the demand was made. The proper assessment of settlement offers is not so facile.

■ "While [a] settlement offer, by itself, may not be determinative, it counts for something." *Burns v. Windsor Insurance Co.*, 31 F.3d 1092, 1097 (11th Cir. 1994). What it counts for, however, depends on the circumstances. Settlement offers commonly reflect puffing and posturing, and such a settlement offer is entitled to little weight in measuring the preponderance of the evidence.[1] On the other hand, settlement offers that provide "specific information ... to support [the plaintiff's] claim for damages" suggest the plaintiff is "offering a reasonable assessment of the value of [his] claim" and are entitled to more weight. *Golden Apple Management Co. v. Geac Computers, Inc.*, 990 F.Supp. 1364, 1368 (M.D.Ala.1998).[2] The Court has adopted this as the correct analysis,[3] and it is consistent with that used by the Magistrate Judge.[4]

■ The defendants describe the plaintiffs' settlement demand as "thoughtful and detailed," (Doc. 26 at 8), but it is not detailed in any way that aids removal. The letter in question simply demands "[l]ump sum payment of $155,000," without the slightest suggestion how in the world the plaintiffs could support such a figure. The only detail in the letter is contained in the succeeding two paragraphs, which discuss other, non-monetary relief the plaintiffs desired as well.[5] The plaintiffs' bald

---

1. *Hall v. CSX Transportation, Inc.*, 2006 WL 3313682 at *3 n. 5 (M.D.Ala.2006); *Jackson v. American General Financial Services, Inc.*, 2006 WL 839092 at *2 n. 2 (M.D.Ga.2006); *Golden v. Dodge–Markham Co.*, 1 F.Supp.2d 1360, 1364–65 (M.D.Fla.1998); *Standridge v. Wal–Mart Stores, Inc.*, 945 F.Supp. 252, 256–57 (N.D.Ga.1996).

2. The demand letter in *Golden Apple*, for example, tallied up separate elements of hard damages, including software costs, consultant costs and personnel costs. 990 F.Supp. at 1368.

3. *Mathena v. Doyle*, 2008 WL 718144 at *2 (S.D.Ala.2008); *Ivory v. American Heritage Life Insurance Co.*, Civ. Action No. 04–0585–WS–B (Doc. 13 at 16–17); *Humphries v. Beverly Health and Rehabilitation Services, Inc.*, Civ. Action No. 04–0154–WS–M (Doc. 16 at 3–4).

4. The defendants cite several cases they believe adopt a different standard. (Doc. 26 at 5–8). The defendants did not cite these cases to the Magistrate Judge or offer any explanation for not doing so. At any rate, the Court has already adopted the test articulated in text.

5. The defendants repeatedly stress that these aspects of the settlement demand must have additional value. Undoubtedly so but, because the defendants have offered no nonspeculative way of quantifying their value, they are irrelevant to the jurisdictional analysis. The same is true of the defendants' reliance on the mere fact the complaint demands compensatory damages, emotional distress

demand is properly construed as mere posturing.

There is additional evidence to support this conclusion. Plaintiffs' counsel submitted an affidavit reflecting that he repeatedly advised the defendants and their counsel that he had inadequate information to make a realistic settlement demand and that he was throwing out a figure only to stake out a settlement posture and to see if the defendants were serious about their suggestion of mediation before he agreed to incur that considerable expense. It might be possible to reject the affidavit as unworthy of credence, but the defendants suggest no reason the Court should do so. On the contrary, the affidavit makes perfect sense and reflects precisely why the judicial skepticism of unadorned settlement demands is warranted.

The defendants argue the Court should ignore the affidavit because it constitutes impermissible post-removal evidence, but this is wrong on several grounds. First, what is prohibited are post-removal changes in the amount in controversy, not post-removal clarifications of the amount that was in controversy at the moment of removal. *Sierminski v. Transouth Financial Corp.*, 216 F.3d 945, 947–49 (11th Cir. 2000). Counsel's affidavit plainly falls in the latter category. Second, although the defendants raised this argument before the Magistrate Judge, they did so only to exclude different portions of the affidavit, specifically, those having to do with coun-

sel's lack of awareness that part of the plaintiffs' claim might be barred by their inclusion in a past class action. (Doc. 17 at 11–13). Having offered no explanation for their failure to challenge other portions of the affidavit before the Magistrate Judge, they will not be permitted to do so now. *Williams v. McNeil,* 557 F.3d 1287, 1292 (11th Cir.2009) ("[A] district judge has discretion to decline to consider a party's argument when that argument was not first presented to the magistrate judge.").[6] Third, even had no affidavit been filed, under the cases cited above the settlement demand alone would not satisfy the defendants' burden.[7]

For the reasons set forth above, the R & R is **adopted** as the opinion of the Court. The motion to remand is **granted**. This case is **remanded** to the Circuit Court of Mobile County.

## *REPORT AND RECOMMENDATION*

BERT W. MILLING, JR., United States Magistrate Judge.

The Motion to Remand filed by Plaintiffs (Docs.12–13) has been referred for report and recommendation, under 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.2. Diversity jurisdiction has been invoked in this Court under 28 U.S.C. § 1332. After consideration, it is recommended that Plaintiffs' motion be granted and that this

---

damages, and punitive damages in unspecified amounts. E.g., *Lowery,* 483 F.3d at 1211, 1213 n. 63 (ordinarily, removal based on the bare pleadings requires an impermissible resort to speculation).

6. The *Williams* Court noted the negation of the efficiencies of referrals, and the possibility of gamesmanship, that would occur could litigants foist on district courts arguments and evidence they neglected to present to the magistrate judge. *Id.* at 1291–92. An adequate explanation for the failure might persuade the

Court to consider a tardy argument despite these concerns, but the defendants offer none.

7. The defendants request permission to file a counter-affidavit. (Doc. 26 at 11). They offer no good reason for having failed to present an affidavit to the Magistrate Judge, and the Court declines to allow them to do so now. *Hammond v. Keehn,* 2009 WL 1114231 at *1 (M.D.Ala.2009) (citing *Williams* ); *Boone v. Tompkins,* 2009 WL 901476 at *1 n. 1 (N.D.Ga.2009) (same).

action be remanded to the Mobile County Circuit Court for all further proceedings.

The facts, very briefly, are as follows. Plaintiffs John and Dorothy Jackson (hereinafter *the Jacksons*) are owners of real property located within Mobile County (Complaint, ¶ 1).[1] The property is secured by a mortgage, made in August 1995, which is "serviced by Defendant Select [Portfolio Servicing, Inc.], as servicing agent for [Defendant Manufacturers and Traders Trust Company] which serves as trustee for the ContiMortgage Trust, the current holder of the mortgage" (Complaint, ¶¶ 5–6). Though the Jacksons "have timely made the payments required under the loan and have not been in default, Select has repeatedly failed to properly credit and acknowledge payments made by Plaintiffs and has treated Plaintiffs as if they are in default;" additionally, Select has "forced placed insurance on" the Jacksons and "taken action in attempt to foreclose and has threatened foreclosure on numerous occasions" (Complaint, ¶ 7). These actions have caused extreme worry, emotional distress and emotional anguish in Plaintiffs (*id.*). On May 23, 2008, Plaintiffs brought this action in the Mobile County Circuit Court, asserting claims of negligence, wantonness/willfulness, and breach of mortgage; the Jackson seek compensatory and punitive damages as well as injunctive and declaratory relief (Doc. 1, ¶ 1; Complaint).

Defendants removed the action to this Court on October 27, 2008, asserting diversity jurisdiction under 28 U.S.C. § 1332 (Doc. 1). Plaintiffs subsequently filed a Motion to Remand this action to the State Courts (Docs. 12–13); Defendants have Responded to the Motion (Doc. 17) to which the Jacksons have Replied (Doc. 18).

In its removal petition, Defendants allege that this Court has diversity jurisdiction under 28 U.S.C. § 1332 and that this action is removable pursuant to 28 U.S.C. § 1446(a) (Doc. 1). In a removal action, the party asserting jurisdiction has the burden of establishing proof of jurisdiction by a preponderance of the evidence. *McNutt v. General Motors Acceptance Corp. of Indiana, Inc.*, 298 U.S. 178, 56 S.Ct. 780, 80 L.Ed. 1135 (1936); *see also Lowery v. Alabama Power Co.*, 483 F.3d 1184, 1210 (11th Cir.2007), *cert. denied sub. nom. Hanna Steel Corp. v. Lowery*, —— U.S. ——, 128 S.Ct. 2877, 171 L.Ed.2d 812 (2008). In a removal action, that burden is upon the defendant. *Wilson v. Republic Iron & Steel Co.*, 257 U.S. 92, 42 S.Ct. 35, 66 L.Ed. 144 (1921). Removal is a statutory remedy which must be narrowly construed so as to limit federal jurisdiction. *Shamrock Oil & Gas Corp. v. Sheets*, 313 U.S. 100, 61 S.Ct. 868, 85 L.Ed. 1214 (1941); *Robinson v. Quality Ins. Co.*, 633 F.Supp. 572 (S.D.Ala.1986).

The Court notes that any civil action over which the district court would have original jurisdiction may be removed by the defendant to the district court for the district in which the action is pending. 28 U.S.C. § 1441(a). The district court has jurisdiction over actions between citizens of different states so long as all plaintiffs are diverse from all defendants, *Strawbridge v. Curtiss*, 7 U.S. 267, 3 Cranch 267, 2 L.Ed. 435 (1806), and the amount in controversy exceeds $75,000. 28 U.S.C. § 1332(b).

There is no apparent dispute that the parties are diverse; Plaintiffs admit as much (Doc. 13, p. 3 n. 1) ("It is not disputed that there is complete diversity of citizenship among the parties"). What is dis-

---

1. The Complaint can be found as an exhibit appended to Defendants' Notice of Removal (Doc. 1, pp. 13–17).

puted is whether the matter in controversy exceeds $75,000. The Jacksons argue that this jurisdictional requirement has not been proven by Defendants (Doc. 13).

Defendants candidly admit that the "Plaintiffs' Complaint does not unambiguously establish that the amount in controversy exceeds $75,000 exclusive of interest and costs" (Doc. 1, ¶ 12). Rather, Defendants point to a letter to Defendants' attorney, dated October 15, 2008 from the Jacksons' attorney, which states as follows:

> To follow up on our discussion, this will communicate my client's terms for settlement of the claims brought in this case. My clients will dismiss and release all claims asserted against the defendants in exchange for the following:
>
> 1. Lump sum payment in the amount of $155,000;
>
> 2. Adjustment of the unpaid balance of the existing loan to reflect all payments made by the Jacksons and the removal of all fees, including late fees and fees related to any foreclosure-related action, which have been imposed as a result of Select's failure to credit payments;
>
> 3. Removal of all derogatory credit information from the information provided by your clients to any credit reporting agency. The reporting should be amended to reflect that the amount is "paid as agreed" or some equivalent description and should not include any reference to any past delinquency or foreclosure action.
>
> I look forward to receiving your client's response.

(Doc. 1, p. 76). In removing this action, Defendants asserted that this letter satisfies the "other paper" language contemplated by 28 U.S.C. § 1446(b)[2] as this is an "unambiguous" demand of more than the jurisdictional amount (Doc. 1, p. 5; Doc. 17, pp. 4–10).

Plaintiffs argue that the Court should reject this letter as it is only "a bare-bones statement of a settlement position, made in anticipation of further negotiations.... The letter does not specify the nature of the damages sought, nor does it quantify those damages. Its intent was to stake out a settlement position designed to gage the Defendants' interest in settlement" (Doc. 13, p. 6). The Jacksons specifically reference one of our sister court's rulings as support for this argument.

In *Daniel v. Nationpoint,* 2007 WL 4533121 (M.D.Ala.2007), a couple seeking a home loan sued a financial corporation which initially offered to finance one hundred percent of the loan, but recanted and offered only ninety percent financing. After the corporation turned down the homeowners' $100,000 settlement offer, the homeowners brought action in state court; the defendants removed on the basis of diversity jurisdiction. The Court, however, granted plaintiffs' motion to remand, finding that because the complaint specified damages of only $74,999, the defendants had not met their burden of proving that the amount in controversy was more than that. Specifically, the Court stated:

> "A settlement letter does not establish to a legal certainty that if the plaintiffs prevailed at trial they would recover more than the jurisdictional amount.

---

**2.** "If the case stated by the initial pleading is not removable, a notice of removal may be filed within thirty days after receipt by the defendant, through service or otherwise, of a copy of an amended pleading, motion, order or *other paper* from which it may first be ascertained that the case is one which is or has become removable, except that a case may not be removed on the basis of jurisdiction conferred by section 1332 of this title more than 1 year after commencement of the action." 28 U.S.C. § 1446(b) (emphasis added).

That the Daniels offered to settle the case for more than $75,000 does not establish to a legal certainty that the amount-in-controversy requirement is met."

*Daniel,* 2007 WL 4533121, at *2 (citations omitted). While Daniel is instructive, the Court notes that it can be distinguished in that the Jacksons, in their Complaint, have not set out the specific amount of damages they seek (Complaint); as such, this Court must examine the facts under a different legal standard, that of a preponderance of the evidence.

■ *Lowery* discussed the preponderance of the evidence standard, noting its definition[3] before going on to state the following:

Defendants must establish the jurisdictional amount by a preponderance of the evidence. We note, however, that in situations like the present one-where damages are unspecified and only the bare pleadings are available-we are at a loss as to how to apply the preponderance burden meaningfully. We have no evidence before us by which to make any informed assessment of the amount in controversy. All we have are the representations relating to jurisdiction in the notice of removal and the allegations of the plaintiffs' [ ] complaint. As such, any attempt to engage in a preponderance of the evidence assessment at this juncture would necessarily amount to unabashed guesswork, and such speculation is frowned upon. *See Lindsey v. Ala. Tel. Co.,* 576 F.2d 593, 595 (5th Cir.1978) (noting, in a removed class action, that "it was not open for defendants to attempt to show" the requisite amount in controversy per capita

where the complaint made insufficient allegations, "[n]or was it open to the district court to speculate" on whether the jurisdictional facts existed).

[W]e conclude that the removal-remand scheme set forth in 28 U.S.C. §§ 1446(b) and 1447(c) requires that a court review the propriety of removal on the basis of the removing documents. If the jurisdictional amount is either stated clearly on the face of the documents before the court, or readily deducible from them, then the court has jurisdiction. If not, the court must remand. Under this approach, jurisdiction is either evident from the removing documents or remand is appropriate.

*Lowery,* 483 F.3d at 1211-12.

In this action, this Court cannot make an informed assessment of the true value of the amount in controversy. While Defendants argue that the Jacksons' offer to settle this action for $155,000, in addition to the other specified inducements, made the question of jurisdiction a black and white issue, the Court is not persuaded. Plaintiffs did not provide a checklist of the damages sought with a corresponding value for each harm asserted; rather, a starting price for negotiation was tendered. For the Court to attach any more significance to the letter than that would be to engage in guesswork and speculation.

The reasoning of *Lowery* and *Daniel* lead this Court to conclude that Defendants have not proven, by a preponderance of the evidence, that the amount in controversy in this action exceeds the jurisdictional requirement of $75,000. On that basis, this action has been improperly removed to this Court. Therefore, it is rec-

---

**3.** "Specifically, the removing defendant must establish the amount in controversy by '[t]he greater weight of the evidence, ... [a] superior evidentiary weight that, though not sufficient to free the mind wholly from all reasonable doubt, is still sufficient to incline a fair and impartial mind to one side of the issue rather than the other.'" *Black's Law Dictionary* 1220 (8th ed. 2004).

ommended that Plaintiffs' Motion to Remand (Docs 12–13) be granted and that this action be remanded to the Mobile County Circuit Court for all further proceedings.

*MAGISTRATE JUDGE'S EXPLANATION OF PROCEDURAL RIGHTS AND RESPONSIBILITIES FOLLOWING RECOMMENDATION AND FINDINGS CONCERNING NEED FOR TRANSCRIPT*

1. **Objection.** Any party who objects to this recommendation or anything in it must, within ten days of the date of service of this document, file specific written objections with the clerk of court. Failure to do so will bar a *de novo* determination by the district judge of anything in the recommendation and will bar an attack, on appeal, of the factual findings of the magistrate judge. *See* 28 U.S.C. § 636(b)(1)(C); *Lewis v. Smith,* 855 F.2d 736, 738 (11th Cir.1988); *Nettles v. Wainwright,* 677 F.2d 404 (5th Cir. Unit B, 1982)(*en banc* ). The procedure for challenging the findings and recommendations of the magistrate judge is set out in more detail in SD ALA LR 72.4 (June 1, 1997), which provides that:

> A party may object to a recommendation entered by a magistrate judge in a dispositive matter, that is, a matter excepted by 28 U.S.C. § 636(b)(1)(A), by filing a "Statement of Objection to Magistrate Judge's Recommendation" within ten days after being served with a copy of the recommendation, unless a different time is established by order. The statement of objection shall specify those portions of the recommendation to which objection is made and the basis for the objection. The objecting party shall submit to the district judge, at the time of filing the objection, a brief setting forth the party's arguments that the magistrate judge's recommendation should be reviewed *de novo* and a different disposition made. It is insufficient

to submit only a copy of the original brief submitted to the magistrate judge, although a copy of the original brief may be submitted or referred to and incorporated into the brief in support of the objection. Failure to submit a brief in support of the objection may be deemed an abandonment of the objection.

A magistrate judge's recommendation cannot be appealed to a Court of Appeals; only the district judge's order or judgment can be appealed.

2. **Transcript (applicable where proceedings tape recorded).** Pursuant to 28 U.S.C. § 1915 and Fed.R.Civ.P. 72(b), the magistrate judge finds that the tapes and original records in this action are adequate for purposes of review. Any party planning to object to this recommendation, but unable to pay the fee for a transcript, is advised that a judicial determination that transcription is necessary is required before the United States will pay the cost of the transcript.

DONE this 5th day of June, 2009.

Carl **PUIATTI**, Petitioner,

v.

**SECRETARY, DEPT. OF CORRECTIONS,** Respondent.

**Case No. 8:92–CV–539–T–17EAK.**

United States District Court, M.D. Florida, Tampa Division.

Aug. 14, 2009.

Edward Soto, Weil, Gotshal & Manges, LLP, Miami, FL, Steven A. Reiss, Weil, Gotshal & Manges, New York, NY, for Petitioner.

Robert Joseph Landry, Office of the Attorney General, Tampa, FL, for Respondent.

### ORDER

ELIZABETH A. KOVACHEVICH, District Judge.

This cause is before the Court on Petitioner Puiatti's amended petition for a writ of habeas corpus under 28 U.S.C. § 2254 (Dkt. 88). Puiatti, an inmate at Union Correctional Institution, challenges his conviction and sentence to death for first degree murder, kidnapping, and robbery, arising out of the Sixth Judicial Circuit, Pasco County, Florida, in case no. 83–1383. After a careful review of the record, this Court finds that Puiatti's petition must be **granted** as to the penalty phase of his trial, and **denied** as to the guilt phase of his trial.

### PROCEDURAL HISTORY

On August 16, 1983, Petitioner Carl Puiatti and his co-defendant, Robert Glock, were charged by indictment with first degree murder, kidnapping, and robbery. Puiatti and Glock were tried jointly by jury. The jury returned a verdict of guilty for both defendants. In a joint penalty phase, the jury recommended death for each by a vote of 11–1. On May 16, 1984, the state trial court judge sentenced Puiatti and Glock to death.

On direct appeal, the Florida Supreme Court affirmed Puiatti's conviction and sentence. *Puiatti v. State*, 495 So.2d 128 (Fla.1986). Puiatti filed a petition for writ of certiorari in the United State Supreme Court. On April 27, 1987, 481 U.S. 1027, 107 S.Ct. 1950, 95 L.Ed.2d 523 (1987), the Supreme Court vacated the Florida Supreme Court's decision, and remanded to the Florida Supreme Court for reconsideration in light of *Cruz v. New York*, 481 U.S. 186, 107 S.Ct. 1714, 95 L.Ed.2d 162 (1987). On rehearing, the Florida Supreme Court reaffirmed the state trial court's decision and sentence. *Puiatti v. State*, 521 So.2d 1106 (Fla.1988). Puiatti applied for a writ of certiorari in the United States Supreme Court. The United States Supreme Court denied Puiatti's application. *Puiatti v. Florida*, 488 U.S. 871, 109 S.Ct. 184, 102 L.Ed.2d 153 (1988).

Puiatti then filed a Rule 3.850 motion, which was summarily denied by the state trial court. Puiatti appealed, and simultaneously filed a state petition for writ of habeas corpus in the Florida Supreme Court. In a consolidated opinion, the Florida Supreme Court affirmed the denial of the Rule 3.850 motion, and denied Puiatti's application for habeas corpus relief. *Puiatti v. Dugger*, 589 So.2d 231 (Fla. 1991).

Puiatti sought relief with this Court by filing a 28 U.S.C. § 2254 petition for writ

of habeas corpus on April 23, 1992. Subsequently, this Court granted a stay and abey motion to allow Puiatti to exhaust remedies and pursue new claims in state court. Pursuant to the stay and abey motion, this Court administratively closed the case.

On January 30, 2003, Puiatti filed a Rule 3.851 motion to vacate sentence in state court, pursuant to *Ring v. Arizona,* 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002) and *Atkins v. Virginia,* 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), alleging that he was mentally retarded. The state trial court denied Puiatti's motion on May 30, 2003. Puiatti appealed, and on November 12, 2004, the Florida Supreme Court issued an order treating the appeal as a motion to relinquish jurisdiction to the state trial court on the issue of mental retardation. *See,* Fla. R.Crim. Pro. 3.203. The Florida Supreme Court granted the motion to relinquish jurisdiction, and relinquished jurisdiction to the state trial court on the issue of mental retardation.

While the question of mental retardation was pending in the state trial court, Puiatti withdrew his claim of mental retardation. After reviewing expert reports and considering Puiatti's withdrawal of his claim, the state trial court issued an order on April 18, 2005, ruling that Puiatti was not mentally retarded. On June 8, 2005, this Court entered its order on the issue of mental retardation, ruling that Puiatti was not entitled to relief under *Ring* and *Atkins.*

On July 19, 2005, Puiatti filed another Rule 3.851 motion to vacate sentence in the state trial court, claiming that new law required the state trial court to consider the motion. The state trial court disagreed, and denied Puiatti's motion on September 7, 2005. The Florida Supreme Court affirmed the denial of relief. *Puiatti v. State,* 939 So.2d 1060 (Fla.2006).

On May 15, 2008, this Court reopened the case, dismissing the original petition without prejudice to Puiatti's filing an amended petition. On November 24.2008, Puiatti filed an amended petition for a writ of habeas corpus and a memorandum of law in support (filed November 21, 2008). The response was filed on April 17, 2009. Puiatti filed a reply on July 15, 2009.

## STATEMENT OF FACTS

The Florida Supreme Court set out the facts in *Puiatti v. State,* 495 So.2d 128 (Fla.1986). In essence, the Florida Supreme Court stated:

The trial record reflects that on August 16, 1983, the female victim, Mrs. Sharilyn Ritchie, arrived at a Bradenton shopping mall. As she exited her automobile, Puiatti and Glock confronted her, forced her back inside the car, and drove away with her. They took $50 from her purse and coerced her into cashing a $100 check at her bank. They drove the victim to an orange grove outside Dade City in Pasco County, where they took Mrs. Ritchie's wedding ring and abandoned her in the orange grove. After driving a short distance, Puiatti and Glock determined that Mrs. Ritchie should be killed, and they returned. Puiatti then shot her twice. Puiatti and Glock drove away, but, when they saw she was still standing, they drove by Mrs. Ritchie again and Glock shot her. When she did not fall, Puiatti and Glock made a third pass with the automobile; Glock shot her another time, and Mrs. Ritchie collapsed.

Four days later, a New Jersey state trooper stopped Puiatti and Glock in Mrs. Ritchie's vehicle in New Jersey, because the license plate was improperly displayed. When neither Puiatti nor Glock could present a valid driver's license, the officer requested the car's registration. Puiatti opened the glove box, and the trooper saw

a handgun. The officer seized that handgun, searched the vehicle, and uncovered another handgun. He then arrested both men for possession of handguns without permits. The police later identified the handgun from the glove box as the murder weapon.

The next day Puiatti and Glock individually confessed to the kidnapping, robbery, and killing. These initial confessions varied only to the extent that each blamed the other as being the instigator of the murder and each offered a different sequence as to who fired the shots at the victim. Both Puiatti and Glock admitted he shot the victim. Three days later, on August 24, 1983, Puiatti and Glock made a joint statement in which they resolved the inconsistencies in their prior individual statements: they agreed that Glock initially suggested shooting the victim; that Puiatti fired the first shots; and that Glock fired the final shots.

Before trial, both Puiatti and Glock moved to sever their trials on the ground that the State intended to introduce each defendant's individual confession. The state trial court denied the motions. At trial, neither Puiatti nor Glock testified on his own behalf, and the three confessions— the two individual confessions and the joint confession—were admitted into evidence. Each defendant objected only to the introduction of the individual confessions. The state trial court overruled Puiatti's and Glock's objections, but, before admitting each individual statement, the state trial court instructed the jury to disregard each defendant's individual confession to the extent that it tended to implicate the other defendant.

The jury found each defendant guilty of first-degree murder, kidnapping, and robbery. In the joint penalty phase, Puiatti did not rely on the mitigating factor of no significant prior criminal history, but offered psychiatric testimony to support the

assertion that he was under Glock's substantial domination at the time of the crimes, Glock argued that his lack of significant prior criminal history and psychiatric evidence suggesting that he would not have participated in the crime but for his association with Puiatti constituted mitigating factors. The jury, by an 11–to–1 vote, recommended the death penalty for both Puiatti and Glock.

The state trial court judge, after weighing the aggravating and mitigating circumstances, sentenced Puiatti and Glock to death. The state trial court judge found no mitigating circumstances and that the state had proven three aggravating factors: (1) the murder was committed to avoid arrest [section 921.141(5)(e), Florida Statutes (1983)]; (2) the murder was committed for pecuniary gain [section 921.141(5)(f), Florida Statutes (1983)]; and (3) the murder was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification [section 921.141(5)(i), Florida Statutes (1983)].

### THE PETITION

The instant petition presents the following grounds for relief:

**Ground One:** The trial court's refusal to sever Puiatti's penalty phase from that of his co-defendant deprived him of an individualized sentencing determination in violation of the Fifth, Sixth. Eighth and Fourteenth Amendments.

**Ground Two:** Puiatti was denied the effective assistance of counsel during the guilt phase of his trial in violation of the Sixth, Eighth and Fourteenth Amendments.

**Ground Three:** Puiatti was denied effective assistance of counsel during the penalty phase of his trial in violation of the

Sixth. Eighth and Fourteenth Amendments.

**Ground Four:** Puiatti was denied effective assistance of counsel on direct appeal in violation of the Sixth, Eighth, and Fourteenth Amendments.

**Ground Five:** Puiatti's Eighth Amendment rights were violated by the trial court's refusal to find mitigating circumstances clearly set out in the record.

**Ground Six:** The trial court's refusal to provide Puiatti's sentencing jury with instructions explaining the aggravating circumstances submitted to it violated Puiatti's Eighth and Fourteenth Amendment rights and rendered his death sentence invalid.

**Ground Seven:** The prosecutor's inflammatory arguments during the guilt and penalty phases of the trial rendered the proceedings fundamentally unfair and unreliable in violation of the Eighth and Fourteenth Amendments.

**Ground Eight:** The admission of Glock's confession violated *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), and deprived Puiatti of his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments.

## STANDARD OF REVIEW

▇▇ A petition for a writ of habeas corpus will issue only if the state court proceedings were flawed to the extent that they violated federal law: "In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991) (citing 28 U.S.C. § 2241). Since this Petition was filed prior to the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), this case is governed by pre-AEDPA law. Generally, pre-AEDPA review of state

court proceedings is less deferential than review under AEDPA.

### A. Evidentiary Hearings

▇▇ In contrast to AEDPA, which requires an evidentiary hearing only if the relevant state-court decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(2), pre-AEDPA law dictates that "a federal evidentiary hearing is required unless the state-court trier of fact has after a full hearing reliably found the relevant facts." *Townsend v. Sain*, 372 U.S. 293, 312–313, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), *overruled on other grounds by Keeney v. Tamayo–Reyes*, 504 U.S. 1, 5, 112 S.Ct. 1715, 118 L.Ed.2d 318 (1992).

Specifically, *Townsend* dictates that a court must grant an evidentiary hearing under any of the following circumstances: (1) the merits of the factual dispute were not resolved in the state hearing; (2) the state factual determination is not fairly supported by the record as a whole: (3) the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing; (4) there is a substantial allegation of newly discovered evidence; (5) the material facts were not adequately developed at the state-court hearing; or (6) for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair fact hearing.

*Id.* at 313, 83 S.Ct. 745.

### B. Procedural Default

▇▇ For a federal court to review a claim in a habeas petition, a petitioner "must have presented his claims in state court in a procedurally correct manner." *Upshaw v. Singletary*, 70 F.3d 576, 579 (11th Cir.1995). "A state court's denial of

a claim based on a procedural violation generally bars a federal court from considering the claim." *Id.* In addition, state courts must have been given a fair opportunity to adjudicate the claims in a petition before they are brought in federal court. *Picard v. Connor,* 404 U.S. 270, 275, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971) (holding that claims not "fairly presented" in state court are unexhausted and will not be entertained in federal court).

■ If a claim is procedurally defaulted, this Court only will entertain the claim if a petitioner can show either (1) cause for default and actual prejudice, or (2) a fundamental miscarriage of justice resulting in the conviction of an "actually innocent" defendant. *See Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977); *Murray v. Carrier,* 477 U.S. 478, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986).

### C. Actual Prejudice

■ Finally, a habeas petition will only be granted if the Constitutional violation at the trial level resulted in "actual prejudice" to the petitioner. *Brecht v. Abrahamson,* 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (holding that simply establishing error in state court proceedings is not sufficient for a writ of habeas corpus to issue). The alleged error must have had a "substantial and injurious effect or influence in determining the jury's verdict." *Id.* at 637–638, 113 S.Ct. 1710.

### PENALTY PHASE

### Ground One: Failure to Sever Penalty Phase

#### A. Procedural Default

■ Respondent urges that Ground One of the Petition is procedurally barred because it was not raised on direct appeal. However, a review of the state record shows that this is not the case. On direct appeal, Puiatti alleged that "[t]he trial

court abused its discretion by denying Puiatti's motion to sever his trial from that of his co-defendant." While this allegation does not specifically implicate the penalty phase of Puiatti's trial as it relates to the Eighth Amendment, the claim objects to the failure to sever the *entire* trial, including the penalty phase. The Florida Supreme Court spoke directly to the issue of severance of the penalty phase of the trial in its opinion: "he [Puiatti] claims that the trial court's denial of a severance in the penalty phase prejudiced him." *Puiatti v. State,* 495 So.2d 128, 131 (1986). Since the claim was fairly presented to the Florida Supreme Court on direct appeal and adjudicated on its merits. Ground One is not procedurally defaulted.

#### B. Evidentiary Hearing

No evidentiary hearing is required as to Ground One, as the claim only requires the Court to determine whether, as a matter of law, Puiatti had a Constitutional right to an individualized sentence, and whether that right was violated. All evidence required to make that determination is in the record.

#### C. Constitutional Violation

Puiatti argues that the Eighth Amendment guarantees a right to individualized sentencing in a capital case. Puiatti mainly relies on *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). which invalidated an Ohio statute for Eighth and Fourteenth Amendment violations, stressing that "the Eighth and Fourteenth Amendments require that the sentencer be given a full opportunity to consider mitigating circumstances in capital cases." *Lockett,* 438 U.S. at 602, 98 S.Ct. 2954. Puiatti also points to several recent cases in which courts have severed sentencings to protect a co-defendant from prejudice. *See United States v. Henderson* 442

F.Supp.2d 159, 160, 162–163 (S.D.N.Y. 2006) (severing the penalty phase of a capital case, and instead ordering sequential sentencing proceedings, to avoid potential prejudice resulting from the comparison of co-defendants' mitigating evidence); *United States v. Catalan–Roman*, 376 F.Supp.2d 96, 106–107 (D.P.R.2005) (severing the penalty phase of a capital case due to a disparity between the strength of two co-defendants' mitigating evidence). In *Catalan–Roman*, the court found unconstitutional the possibility that "[t]he jury could possibly balance one defendant against the other and decide which of the two was worse and deserved the harshest penalty." *Catalan–Roman*, 376 F.Supp.2d at 107. Puiatti asserts that the penalty phase of his trial deprived him of the opportunity to effectively present mitigating evidence to the jury, and therefore compromised the individual sentencing determination guaranteed by the Eighth and Fourteenth Amendments.

In response, Respondent argues that joint trials are an essential part of the criminal justice system. Citing *Richardson v. Marsh*, 481 U.S. 200, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987). Respondent contends that "[j]oint trials generally serve the interests of justice by avoiding inconsistent verdicts and enabling more accurate assessment of relative culpability." *Id.* at 209–210, 107 S.Ct. 1702. Respondent also cites several cases upholding decisions not to sever joint trials. In *Zafiro v. United States*, 506 U.S. 534, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993), the Supreme Court held that a trial court is not required to sever the trials of co-defendants who present mutually antagonistic defenses. Likewise, the Eleventh Circuit has held that a joint trial is inappropriate only if it "(1) would compromise a specific trial right of one of the defendants, or (2) would prevent the jury from making a reliable judgment about guilt or innocence." *United States v. Browne*, 505 F.3d 1229, 1268–

1269 (11th Cir.2007) (citations omitted). Respondent asserts that since Puiatti and Glock "participated as a team in the kidnap-murder of Sharon [sic] Ritchie, it is not unreasonable for a jury to also consider their culpability and penalties together." Response to Petition at 22. Respondent compares a joint penalty phase to a situation in which a capital defendant seeks to mitigate his own sentence by asking a jury to consider the sentence imposed on an accomplice or a co-defendant.

■ Respondent's points may be valid with respect to joint *guilt phases;* however, Puiatti complains of Constitutional violations arising out of a joint *penalty phase.* Puiatti's argument is not that he and Glock presented "antagonistic defenses," but rather that Glock's involvement in Puiatti's penalty phase substantially impaired Puiatti's ability to present mitigating evidence, as guaranteed by *Lockett.* Respondent is correct that a capital defendant can ask a jury to consider his co-defendant's sentence, hoping to receive a similar or lesser sentence, but the capital defendant's doing so is fundamentally different from the alleged violation in this case. Puiatti alleges not only that the jury compared Puiatti to Glock in determining their respective sentences, but also that the sentencing process fundamentally compromised the jury's ability to differentiate one defendant from the other, and deprived Puiatti of individualized consideration in sentencing. Even under the precedent set forth in *Browne*, a joint penalty phase was inappropriate, because it compromised one of Puiatti's Constitutional rights at trial: the right to an individualized determination of sentence in a capital case.

This Court need not decide whether the Eighth and Fourteenth Amendments guarantee the right to a separate penalty phase in *any* capital case involving co-defendants. *Lockett* and its progeny, as applied

to the facts of this case, indicate that Puiatti had a Constitutional right to a severed penalty phase.[1] *Lockett* makes it clear that a defendant has the right to the sentencers' full and unencumbered consideration of mitigating factors, and any interference with that right is a Constitutional violation. While this Court frowns upon undue severance, Puiatti has sufficiently implicated a Constitutional violation because he had a Constitutional right to individual determination of sentence. The question then becomes whether that violation resulted in actual prejudice to Puiatti.

### D. Actual Prejudice

Even if Puiatti sufficiently alleges a Constitutional violation, a writ of habeas corpus will not issue unless the Constitutional violation resulted in actual prejudice at the trial level. Puiatti points to the structure of the penalty phase, alleging the jury was not given the opportunity to consider Puiatti's individual mitigating factors. Respondent argues that Puiatti has not shown actual prejudice, and that any Constitutional violation in Puiatti's penalty phase does not rise to the level required for a writ of habeas corpus to issue.

### i. Opening Arguments and Witnesses

■ There is ample evidence in the record to suggest that Puiatti's penalty phase was significantly different from what it would have been had Puiatti's motion to sever been granted. At the beginning of the penalty phase, the state trial court asked counsel whether they wanted to make opening statements. Puiatti's attorney told the court that she had an opening statement prepared and would like the opportunity to give the statement, while the State indicated it was prepared but had no preference on the issue, Glock's attorney, however, urged the court not to allow an opening statement from any party. The state trial court declined to allow opening statements, which it likely would have allowed had Puiatti been sentenced in a severed penalty phase.[2] R. 2216–2217. While not rising to the level of actual prejudice to Puiatti, this decision not to allow opening statements was the first of many ways in which Puiatti's joint penalty phase differed from an individual penalty phase.

Puiatti alleges prejudice stemming from the fact that the jury listened to two sets of mitigation witnesses during the penalty phase. The order of witnesses during the penalty phase was as follows: (1) witnesses for the State; (2) Puiatti's expert witness: (3) Glock's witnesses, including an expert witness; and (4) the remainder of Puiatti's witnesses. Each witness was cross-examined by the two other parties. Puiatti argues that the order of witnesses and Glock's cross-examination of Puiatti's witnesses prejudiced the jury to the point that the its recommendation as to Puiatti's sentence was not determined as to Puiatti as an individual. Respondent counters that the record reflects that Puiatti did not

---

1. Respondent argues this Court must reject Puiatti's assertion of an Eighth Amendment violation because it rejected Glock's habeas petition, *Glock v. Dugger,* 752 F.Supp. 1027 (M.D.Fla.1990). However, the sentencing proceedings affected each co-defendant differently, and resulted in varying levels of prejudice. Further, this Court did not reach the issue of an Eighth Amendment violation in the *Glock* decision, because it was not raised in Glock's habeas petition.

2. Puiatti also argues that prejudice is evident from the fact that Puiatti's family members were not allowed to remain in the courtroom during the penalty phase as a result of Glock's objections to their doing so. Glock urged the state trial court judge to exercise his discretion and not allow Puiatti's non-testifying family members to remain in the courtroom during the penalty phase. R. 2221. While this is a factor that distinguished Puiatti's penalty phase from a typical penalty phase, it does not inform any prejudice.

object to the order of witnesses, and was in fact happy to allow his expert witness to testify out of order.[3] Further, Respondent argues that the State asked the majority of questions on cross-examination, and that Glock's cross-examination of Puiatti's witnesses had a minimal impact on the proceeding.

 That Puiatti did not object to the order of witnesses during the penalty phase does not preclude him from claiming now that the order of witnesses prejudiced the jury. Puiatti called his expert witness. Dr. Donald Delbeato. to support the assertion that Puiatti "acted under extreme duress or under the substantial domination of another person," a mitigating factor under Florida law. *See* Fla. Stat. § 921.141(6)(e). Dr. Delbeato testified that Puiatti was easily influenced, and likely would not have committed the offenses but for Glock's influence. In a severed penalty phase, Dr. Delbeato would have been cross-examined only by the State. However. Dr. Delbeato was cross-examined not only by the State, but also by Glock's counsel. Further, Glock called his own expert witness to attest that *Glock* was the more easily influenced of the two co-defendants, in direct contradiction to the testimony of Puiatti's witnesses.[4] Even disregarding the order in which the witnesses testified, Puiatti's ability to present mitigating evidence was substantially diminished by the joint proceeding. Respondent correctly states that courts have allowed defendants to be *tried* together even when they present contradictory defenses, but a joint trial does not implicate the Eighth Amendment as a joint capital penalty phase does. Even if Puiatti's witnesses had been cross-examined only by the State at the joint penalty phase of the trial, the proceeding would have implicated Puiatti's Constitutional rights, as the Constitution does not permit a penalty phase in which two co-defendants attempt to present mutually exclusive mitigating factors. *See, e.g., Lockett,* 438 U.S. 586, 98 S.Ct. 2954. By its very nature, such a joint penalty phase impedes a jury's ability to individually consider each defendant, as demanded by the Eighth and Fourteenth Amendments.

*ii. Puiatti's Failure to Testify*

Puiatti also complains that Glock testified on his own behalf, while Puiatti could not testify because he would have been impeached with two prior convictions that were otherwise inadmissible due to his waiver of the "prior criminal activity" mitigating factor. *See* Fla. Stat. § 921.141(6)(a). Glock's testimony, Puiatti alleges, further contributed to the jury's view that the penalty phase was a "competition between defendants over who has more or stronger mitigation or who is a better or more forthcoming person." Amended Petition at 14. Puiatti claims that "the denial of severance ... clearly penalized Puiatti for exercising his right not to testify." *Id.*

Respondent counters that Glock's testimony was insignificant, as shown by the fact that Puiatti's counsel opted not to cross-examine Glock. Further, Respondent asserts that Puiatti voluntarily chose not to assert the "prior criminal activity" mitigating factor, and cannot now complain that he did not have the opportunity to testify.

---

3. The state trial court record is unclear as to the reasoning behind Puiatti's expert witness's testifying out of order.

4. Respondent asserts that the testimony of Glock's expert, Dr. Gerald Mussenden, was cured by Puiatti's ability to cross-examine Dr. Mussenden. However, even if Puiatti's counsel effectively discredited Dr. Mussenden's testimony, Puiatti's expert witness would not gain any credibility he had lost as a result of Glock's cross-examination.

Respondent is correct in pointing out that Puiatti chose not to testify on his own behalf. Puiatti could not reap the benefits of testifying without facing impeachment with prior convictions on cross-examination. However, Puiatti's choosing not to testify on his own behalf would not have been significant to the jury but for Glock's testifying. A defendant has the right not to testify in a penalty phase, and any suggestion to the jury that the exercise of that right is somehow significant is violative of the Constitution. *Griffin v. California*, 380 U.S. 609, 614–615, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965) (holding that while a jury may, as a practical matter, infer guilt on its own from a defendant's failure to testify, but that comment on that failure to testify violates the Constitution); *Carter v. Kentucky*, 450 U.S. 288, 101 S.Ct. 1112, 67 L.Ed.2d 241 (1981) (holding that if a defendant requests it, a trial judge must instruct a jury that no adverse inference can be drawn from a defendant's failure to testify). But for the joint penalty phase, Puiatti's jury would not have been able to compare Glock's testifying to Puiatti's silence. The Fifth Amendment does not allow a joint penalty phase where the testimony of one defendant highlights to the jury the other defendant's failure to testify. *See Griffin*, 380 U.S. 609, 85 S.Ct. 1229; *Carter*, 450 U.S. 288, 101 S.Ct. 1112.

### iii. Prosecutor's Closing and Jury Instructions

Puiatti alleges that the prosecutor in the penalty phase took advantage of the joint proceeding to further de-individualize Puiatti, as the prosecutor had done during the guilt phase of Puiatti's trial. Puiatti complains that the prosecutor called Puiatti and Glock "as alike as two peas in a pod." R. 2482. Further, the prosecutor described the co-defendants as having a "symbiotic relationship," arguing that neither would have committed the crime without the other. R. 2483. Respondent contends that there was nothing improper about the prosecutor's closing argument, as shown by the lack of objection from Puiatti's counsel, and that the prosecutor was simply urging that *both* defendants deserved the death penalty.

While Respondent is correct that under the circumstances, the prosecutor's closing argument was not improper, the prosecutor was only able to make such an argument because the penalty phase was joint. Had Puiatti's penalty phase been severed from Glock's, the prosecutor would have been forced to argue directly against Puiatti's mitigating circumstances, rather than to group the co-defendants together, further de-individualizing Puiatti. Of most concern is the prosecutor's "symbiotic relationship" argument; Puiatti and Glock were already battling to convince the jury that each of them was under the influence of the other, and the prosecutor used that battle to suggest that they were equally culpable, and deserved the same punishment. The prosecutor cannot be faulted for his closing argument, but it compounded the lack of individualization already present in the case.

Puiatti also alleges that prejudice is evident from the actions and words of the state trial court during sentencing, and the subsequent treatment of the case on direct and collateral appeal. Puiatti points to a portion of the jury instructions in which the state trial court judge instructed the jury: "it is now your duty to advise the court as to what punishment should be imposed upon Glock and Puiatti." R. 2521. Puiatti asserts that the phrasing of the jury instructions suggest that the jury should impose a *single punishment* on Puiatti and Glock, rather than determine their sentences individually. Respondent counters that the jury instructions taken as a whole clearly individualize the defendants:

Now, if a majority of the jury determine that Robert Glock, II, should be sentenced to death, your advisory sentence will be a majority of the jury, by a vote of—and a number of whatever number voted so voted advise and recommend to the Court that it impose the death penalty upon Robert D. Glock, II.

If a majority of the jury determine that Carl Puiatti should be sentenced to death, your advisory sentence will be a majority of the jury, by a vote of—and indicated whatever that vote is, advise and recommend to the Court that it impose the death penalty upon Carl Puiatti.

On the other hand, if by six or more votes, the jury determines that Robert D. Glock. II, should not be sentenced to death, your advisory sentence will be the jury advises and recommends to the Court that it impose a sentence of life imprisonment upon Robert D. Glock, II, without possibility of parole for twenty-five years.

And if by six or more votes the jury determines that Carl Puiatti should not be sentenced to death, your advisory sentence will be the jury advises and recommends to the Court that it impose a sentence of life imprisonment upon Carl Puiatti without possibility of parole for twenty-five years.

R. 2525–2527. While the jury instructions were not prejudicial to Puiatti, it is disconcerting that the court's sentencing order tended to refer to Puiatti and Glock as a pair, rather than as individuals: "They were both about the same age and the same intelligence. They both had the same education. They were both raised in middle class surroundings." Findings in Support of Sentences at 5.

### iv. Appellate Review

Puiatti also points to the Florida Supreme Court's treatment of Puiatti and Glock as evidence that the joint penalty phase created the impression that the codefendants were a singular unit. Puiatti argues that the Florida Supreme Court's consolidation of the cases and issuance of a joint opinion further contributed to Puiatti's denial of individualized consideration in violation of the Constitution. Further, Puiatti points out that the state trial court, when subsequently reviewing Puiatti's Rule 3.850 motion, incorrectly referenced Puiatti's testifying "on his on [sic] behalf" during the penalty phase, when it was actually Glock who spoke on his own behalf.

Respondent argues that the Florida Supreme Court's treatment of the Puiatti and Glock cases was not a deprivation of individual consideration, but rather a matter of convenience. Respondent points out that the Florida Supreme Court held separate oral arguments for the Puiatti and Glock cases, albeit on the same day, and devoted separate sections of their opinion to each defendant. Respondent also asserts that the state trial court may have made a typographical error when it referred to Puiatti's testifying on his own behalf: "It is not clear whether the Court intended to say Mr. Puiatti (Puiatti's father) spoke on his son's behalf or whether it intended to say that Puiatti testified on his own behalf." Response to Petition at 32.

While the treatment of Puiatti and Glock as a pair by a sentencing *jury* is potentially violative of the Constitution, consolidation of their cases by the Florida Supreme Court is of less concern. The Florida Supreme Court heard separate arguments from the defendants, and conducted separate analyses in the joint opinion. Unlike the jury at the penalty phase, whose reasoning process is uncertain, it is clear that the Florida Supreme Court separated the two defendants for the purpose of appellate review, and afforded each a fair hear-